# ATTACHMENT A

STEPHEN S. HART, ESQ.
HART LAW OFFICES, P.C.
482 Constitution Way, Suite 313
Idaho Falls, ID 83402-3537
Phone: (208) 524-3272
Fax: (208) 524-3619
Idaho State Bar # 1987
Email: shart@hartlawif.com

Attorneys for Defendant, Tel James Boam

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TEL JAMES BOAM,<br><br>Defendant. | **Case No. 4:20-CR-00188-BLW-1**<br><br>**DECLARATION OF TEL JAMES BOAM** |

I, TEL JAMES BOAM HAILEY BOAM, Hereby affirm, state and declare as follows:

1. I am over the age of 18 and competent to make the statements set forth herein. I make these statements based on my own knowledge and/or observations.

2. I am the defendant in this matter.

3. Robin Dunn represented me in the current case from the beginning through my sentencing in this matter.

4. Throughout the entire period, Mr. Dunn continually informed me that "we can't lose." He told me "it was a very valid case". He stated to me that the Court would have to admit our evidence and we would win at trial.

5. In the beginning I frequently went to Mr. Dunn's office to prepare for my case. Mr.

Dunn was unable to stay focused on my case. Often we would discuss my case for five (5) minutes and then Mr. Dunn would then spend the rest of the hour reminiscing over his life, experiences, and horse racing.

6. Mr. Dunn always seemed disconnected. He could not remain focused on the facts of my case. He wanted to talk about everything other than my case.

7. On some occasions I would arrive, and he would soon leave without explanation, returning in about an hour but even more increasingly disconnected.

8. I noticed he was frequently swallowing a pill. He said it was Lorazepam. I saw him swallow pills frequently during my time with him and wondered if he was taking more than prescribed.

9. On occasion he offered me some of his pills, but I declined.

10. On information and belief from my legal counsel, the side effects of Lorazepam include drowsiness, mood changes, agitated or talkative behavior, depression, thinking problems, confusion, and hallucinations.

11. There was never a strategy or plan formed for my case. I had no idea how he would present a defense. When I tried to talk about the evidence, he referred to the government's evidence as "circumstantial." He informed me that the jury could not convict me on circumstantial evidence as there must be proof beyond a reasonable doubt. I was never sure as to what this meant.

12. Mr. Dunn told me about the hotel incident, referred to by Dunn as 404(b) evidence, and he assured me this evidence would never be admitted as it was too prejudicial.

13. Mr. Dunn said he had emails from Melinda my ex-wife and the natural mother of the

minor child , which verified she was giving Ambien to the minor. He did not present them in court.

14. Mr. Dunn informed me he was going to play the forensic interviews of the minor child at the time of trial and then afterward impeach the minor child with her inconsistencies. This never occurred.

15. Mr. Dunn informed me that the court would not let in the two (2) polygraphs I had Taken and passed. This was a huge disappointment.' I did not learn until the past month that he did not follow through and identify exactly what he wanted to admit in order for the Court to again consider the request to allow the two (2) polygraphs into evidence at the time of trial.

16. Early in the case I became aware of a hearing which took place before Judge Bush. After the hearing Mr. Dunn informed me that Judge Bush understood my case and it would go well. I was led to believe Judge Bush would be my trial judge. Later when it was assigned to this Court. Mr. Dunn told me he checked around and that he learned that Judge Winmill was a very liberal judge, and our chances were now very good to win this case.

17. On the first day of trial, when the government made their motion to prohibit the introduction of undisclosed evidence, was the first time that I was aware that Mr. Dunn had not timely disclosed witnesses, exhibits and experts properly. There was more than enough time for Mr. Dunn to meet all of the Court's deadlines.

18. I was offered a plea bargain before trial. However, I was told by Mr. Dunn and the court appointed attorney with Mr. Dunn that I should decline the offer. Mr. Dunn told me that I should decline because it was not a fair deal. Mr. Dunn did not discuss what I know now to be the "Federal Sentencing Guidelines", or how they could affect my sentence. Mr. Dunn did not advise of the "pros and cons" of acceptance or rejection of the offered plea bargain. I was never

informed of the point system, or what I know now as "downward departures". Mr. Dunn assured me that we would win at trial and I should reject it. I was ill informed and confused, but followed the very strong advice of my attorney Robin Dunn and rejected it.

19. As the trial unfolded my worst nightmares came true. The evidence against me seemed strong and my defense quite weak at best. The evidence Mr. Dunn had or represented to me that he had was not presented or presented poorly. I became very anxious and ill during the trial.

20. My personal trial testimony was directed by Mr. Dunn. By the time that I took the stand my brain was numb, and I was so anxious I could not think straight. I was too far in to take any other course of action other than the action proposed by Mr. Dunn.

21. After I was found guilty, the Court ordered a Presentence Investigation. A copy of the PSI was never delivered to me at the jail. I was never advised that the PSI had been completed and was available for me to review. I called numerous times to Mr. Dunn's office to ask about the PSI. Mr. Dunn never brought one to me and never discussed it with me. I never intentionally avoided reading the PSI.

22. On the last visit by Mr. Dunn before sentencing, I asked him where the PSI was and had he seen it. Mr. Dunn replied that I did not need to see it. Mr. Dunn said it was full of garbage. Mr. Dunn steadfastly refused stating that I didn't need to see it and that it did not matter. Thereafter we proceeded to my sentencing hearing.

23. At trial, the Court asked if I had seen the PSI. I responded I had not. This Court advised Mr. Dunn it was his responsibility to let me read the PSI and explain it to me.

24. The Court called a recess, which upon information and belief, was a total of ~~nine (9)~~ thirty-two (32)

minutes. I was first taken to a booking room where I could meet with Mr. Dunn. A court officer then came to the room and said it was inappropriate for us to be in that room and moved us to a room with a window between us. The only way I could read the report was for Mr. Dunn to hold one page at a time up to the glass. It was difficult to read. The full PSI report is eighty-three (83) pages in length. I had read only about three (3) pages in the remaining ~~six (6) minutes~~ time TJ when a female officer entered and stated we must be back in court now. The Court asked if I had read the eighty-three (83) page report ~~in the nine (9) minute break~~ during the recess. TJ. I was scared to death, and afraid I would anger the Court, so I replied that I had though it was impossible. When I returned to court, I had no idea what the report stated or if it was accurate.

25. This Court originally considered allowing me a two (2) day recess to allow me to read and review the PSI with Mr. Dunn. However, a false rumor from a marshall in the courtroom convinced the court that I had an opportunity to review the PSI in the jail and refused to do so. This is absolutely false. As a result of that statement from a marshall, the two (2) day recess was not granted.

26. I was not able to address anything in the report I had not read or reviewed and was sentenced to what is now the remainder of my life.

**I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.**

Dated this 28 day of Feb, 2025

T.J. BOAM
Defendant