# ATTACHMENT E

STEPHEN S. HART, ESQ.
HART LAW OFFICES, P.C.
482 Constitution Way, Suite 313
Idaho Falls, ID 83402-3537
Phone: (208) 524-3272
Fax: (208) 524-3619
Idaho State Bar # 1987
Email: shart@hartlawif.com

Attorneys for Defendant, Tel James Boam

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TEL JAMES BOAM,<br><br>Defendant. | **Case No. 4:20-CR-00188-BLW-1**<br><br>**DECLARATION OF DEBORAH DAVIS, Ph.D.** |

I, DEBORAH DAVIS, Ph.D., Hereby affirm, state and declare as follows:

1. I am over the age of 18 and competent to make the statements set forth herein. I make these statements based on my own knowledge and/or observations.

2. I was asked by counsel for Tel James Boam to review materials, including videos of forensic interviews and trial testimony of the minor T.A. and provide a report, based upon my education, experience and training, concerning the issue of "false memory" and "false reports".

3. Attached to this *Declaration* is a true and correct copy of a written report that I have

**LEFT BLANK INTENTIONALLY**

prepared in the above-entitled matter .

**I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.**

Dated this _3__day of March, 2025

DEBORAH DAVIS, Ph.D.
Declarant

**Deborah Davis, Ph.D.**
Department of Psychology/296
College of Liberal Arts
Reno, Nevada 895570062
Tel: (775) 722 7779
FAX: (775) 784-1126
e-mail: debdavis@unr.edu

UNIVERSITY OF NEVADA
•Reno

March 2, 2025

Dear Mr. Swafford,

You have asked me to provide an analysis of the above referenced case, with regard to the potential that the alleged victim provided a false report of sexual abuse based at least in part on a false memory: and to further comment on the utility of an expert on false memory for trial testimony.

I first review my qualifications as an expert. Next, I review causes of false reports, with particular attention to the issue of false memories. Finally, I provide an analysis of applications to this case.

## I. EDUCATION AND EXPERTISE

**See CV for Full Details**

I attended high school in Houston, Texas, graduating in 1968. I then received my undergraduate degree in Psychology from the University of Texas in Austin (1970), followed by a Ph.D. in Psychology from Ohio State University (1973), with a major in Social Psychology, and minors in Cognitive Psychology and Quantitative Methods (Statistics). I then spent 2 years as a Post-Doctoral Fellow, also at Ohio State University.

I have taught Psychology at three Universities: Southern Illinois University 1975-1977; Georgia State University 1977-1978; and University of Nevada, Reno 1978- present. I am currently Professor of Psychology at the University of Nevada, Reno. I am also a member of the faculty of the National Judicial College, located in Reno.

I have taught graduate and undergraduate courses on memory, suggestion, and false reports, and on eyewitness identification issues: including "Human Memory" "Memory on Trial" "Psychology and Law" "Forensic Psychology" and others featuring 1-2 lectures on the topic (Social Psychology, Personality, Introductory Psychology).

I have also taught a number of CLE seminars on memory, including organizations such as California Attorneys for Criminal Justice, Reno Public Defender's Office, National Defender Investigator Association, Northern California Defender Investigator Association, Journal of Air Law and Commerce Symposium, Osgood Hall Law School, National Counsel of Juvenile and Family Court Judges, the National Judicial College—and others.

I have published over 100 articles and book chapters, including at least 22 articles and book chapters fully on issues of witness memory, and a number of other articles addressing memory issues in part. The former include a 150 page review of the eyewitness research literature and two chapters in the Handbook of Eyewitness Psychology. A number of these concern false reports and false memories of sexual abuse.

Finally, I have testified in at least 120 cases involving eyewitness memory, child witnesses, suggestibility and memory distortion, and/or repressed and recovered memories: in Alaska, Arizona, California, Colorado, Nevada, Oregon, New Hampshire, Delaware, Washington State, Wisconsin, and Wyoming.

**Interrogation and Confession**

I also have significant expertise on suggestion and false reports deriving from experience in the area of interrogation and false confessions. I have published approximately 20 articles and chapters on the topic of police interrogation and confessions, and presented approximately 16 times on this topic at conferences of scientific organizations and 14 times at Continuing Legal Education events for legal organizations and the National Judicial College. In addition, I have published a number of other articles and chapters that include discussion of interrogations and confession, and many others that address the broader topic of social influence. Finally, I have published many other articles in other areas of psychology.

I was awarded a grant from the Department of Justice/Federal Bureau of Investigation to perform research on interrogation techniques in 2012.

I have completed the basic and advanced interrogation training seminars offered by John Reid, Assoc. and Wicklander-Zulawski (the primary interrogation training organizations in America), on criminal and corporate interrogation.

I have testified as an expert witness on interrogation and confessions in Alaska, Colorado, California, Idaho, Illinois, Louisiana, Michigan, Minnesota, Missouri, Mississippi, New Mexico, New York, Oregon, South Carolina, Pennsylvania, Utah, and Washington State.

## II. CAUSES OF FALSE REPORTS

There are four primary causes of false reports generally, and specifically of sexual abuse: (1) intentional deception, (2) distortion of memory/belief, (3) guessing, and (4) compliance with suggestion.

## III. INTENTIONAL DECEPTION

False reports of sexual abuse may be intentionally deceptive. This is more likely to occur among older children and adults rather than very young children. Personal motivations that may promote false reports include dislike of the accused, to get rid of or hurt the accused, revenge, attention, imitation (fitting in with peers), or misinterpretation of the accused's actions. They may also be promoted by personal motivations of adults: such as a relative or friend, therapists/counselors, forensic interviewers and others. This is most likely to occur in the context of negative social dynamics such as conflict between adults or between parents and adult children, divorce, custody issues, influence from siblings, etc.[1] They may also be the result of psychopathology in the accuser or others.

## IV. THE EXISTENCE AND CAUSES OF EXTREME FALSE AUTOBIOGRAPHICAL MEMORIES

### A. EVIDENCE THAT EXTREME FALSE MEMORIES DO OCCUR

Overwhelming evidence exists that false autobiographical memories can develop for events ranging from the relatively mundane (e.g., school performance) to the seemingly impossible (e.g., having been abducted by aliens, having sex with the devil). While it is relatively easy to believe that one might remember details of one's past falsely, many find it largely, even completely, implausible that a person could falsely remember "extreme" experiences such as alien abduction, satanic ritual abuse, sexual abuse by one's father, or having witnessed or committed a horrific crime oneself.

---

[1] Bottoms, B. L., Najdowski, C., & Goodman, G. S. (Eds.) (2009). Children as victims, witnesses, and offenders: Psychological science and the law. NY: Guilford Press.

Thoennes, N., & Tjaden, P. G. (1990). The extent, nature, and validity of sexual abuse allegations in custody/visitation disputes. *Child Abuse & Neglect, 14,* 151-163.

Trocme, N., & Bala, N. (2005). False allegations of abuse and neglect when parents separate. *Child Abuse & Neglect, 29,* 1333-1345.

Lamb, M. E., Hershkowitz, I., Orback, Y. & Esplin, P. W. (2008). *Tell me what happened: Structured investigative interviews of child victims and witnesses.* NY: Wiley-Blackwell.

Lamg, M. E., La Rooy, D. J., Malloy, L. C., & Katz, C. (Eds.) (2011). Children's testimony: A handbook of psychological research and forensic practice. NY: Wiley-Blackwell.

O'Donohue, W. T., Benuto, L., & Fanetti, M. (2010). Children's allegations of sexual abuse: A model for forensic assessment. *Psychological Injury and Law, 3,* 148-154.

Wakefield, H., & Underwager, R. (1991). *Behavioral Sciences and the Law, 9,* 451-468.

**Real Life Examples:** Nevertheless, countless real life examples of each of the aforementioned types of extreme false memories have been documented in the scientific literature: witnessing murder[2], alien abduction[3], sexual abuse (including satanic ritual abuse)[4], witnessing dramatic fatal accidents[5], and committing a crime that one did not actually commit[6].

**Laboratory Studies:** Countless laboratory studies have demonstrated that false memories for autobiographical events can be planted. Specific procedures have been developed and/or tested that have been shown to lead to the development of rich (realistic sensory detail) false autobiographical memories in a subset of study participants. The percent of participants who develop such false memories varies between a very small minority to a substantial majority, depending upon the nature of the event in question and the procedures deployed upon the participant.

---

[2] Loftus, E. F., & Ketcham, K. (1994). *The Myth of Repressed Memory: False Memories and Allegations of Sexual Abuse.* St. Martin's Griffin. (see account of Franklin case)

Jelicic, M., Smeets, T., Peters, M. J. V., Candel, I., Horselenberg, R., & Merckelbach, H. (2006). Assassination of a controversial politician: Remembering details from another non-existent film. *Applied Cognitive Psychology, 20,* 591–596.

[3] Clancy, S. (2005). *Abducted: How People Come to Believe They Were Abducted by Aliens.* Harvard University Press.

[4] Loftus, E. F., & Ketcham, K. (1994). *The Myth of Repressed Memory: False Memories and Allegations of Sexual Abuse.* St. Martin's Griffin.
Ofshe, R. (1994). *Making Monsters.* Scribner.
[5] Crombag, H. F. M., Wagenaar, W. A. , Van Koppen, P. J. ((1996). Crashing memories and the problem of source monitoring. *Applied Cognitive Psychology, 10,* 95-104.

Ost, J., Vrij, A., Costall, A., & Bull, R. (2002). Crashing memories and reality monitoring: Distinguishing between perceptions, imaginations and 'false memories'. Applied Cognitive Psychology, 16, 125–134.

[6] Gudjonsson, G. H.; Sigurdsson, J. F.; Sigurdardottir, A. S.; Steinthorsson, H.; Sigurdardottir, V. M. (2014). The role of memory distrust in cases of internalized false confession. *Applied Cognitive Psychology, 28(3),* 336-348.

Henkel, L. A.; Coffman, K. J.; (2004). Memory Distortions in Coerced False Confessions: A Source Monitoring Framework Analysis. *Applied Cognitive Psychology, 18(5),*.567-588.

Kassin, S. M. (2007). Internalized false confessions. *In:* Toglia, M. P., Read, J. D., Ross, D. F., Lindsay, R. C. L. (Eds); The handbook of eyewitness psychology, Vol I: Memory for events.Mahwah, NJ, US: Lawrence Erlbaum Associates Publishers, pp.175-192,

Shaw, J. & Porter, S. (2015). Constructing rich false memories of committing crime. *Psychological Science.* Online First

False memories have been planted in participants for relatively trivial events such as remembering hearing sounds or words, seeing various (actually unseen) objects, saying things they did not say, and many more. However, a number of studies have planted false memories for more dramatic real life events: such as being lost in a mall or on a mountainside, being bitten by a vicious animal, riding in hot air balloons, meeting fictional characters at Disneyland, witnessing demon possession, being painfully injured, and many others[7]. Perhaps closest to the circumstances of crime, false memories have been planted for personally committing specific aggressive acts[8], and for committing specific minor crimes[9].

False memories can be developed in people of normal cognitive function and lacking any mental illness or abnormality. Even those with purportedly near perfect autobiographical memory (who can remember every day of their lives) have been led to develop false memories[10]

**The Nature of Memory**

Many think of memory as akin to a movie that can be replayed in our heads, consisting of sensory images replaying the event in question. Memory science has revealed that, instead, memory consists of at least the following: sensory images, beliefs (the story we tell ourselves about what happened), and information relevant to the plausibility of those beliefs. A memory judgment criterion is then applied to these cognitions, assessing whether the "memory" is or is not a real memory for a real event.[11]

***The Role of Sensory Images***

Most think of event memory in terms of the ability to replay the sensory images of the event in one's mind (sounds, sights, physical sensations). As noted above, such images

---

[7] Loftus, E. F. & Davis, D. (2006). Recovered memories. *Annual Review of Clinical Psychology, 2, 469-498.*

Loftus, E. F.; Cahill, L. (2007). Memory Distortion: From Misinformation to Rich False Memory. *In:* Nairne, J. S. (Ed),The foundations of remembering: Essays in honor of Henry L. Roediger, III New York, NY, US: Psychology Press, pp.413-425, 451.

Davis, D. & Loftus, E.F. (2007) Internal and external sources of misinformation in adult witness memory. In M.P. Toglia, J.D. Read, D.F. Ross, & R.C.L. Lindsay (Eds). *Handbook of eyewitness psychology* (Vol I). Memory for events. Mahwah, NJ: Erlbaum. p 195-237.

[8] Laney, C., & Takarangi, M. K. T. (2013). False memories for aggressive acts. *Acta Psychologica, 143,* 227-234.

[9]

[10] Patihis, L., Frenda, S. J., LePort, A. K. R., Petersen, N. et al (2010). False memories in highly superior autobiographical memory individuals. *Proceedings of the National Academy of Sciences, 110 (52)* 20947-20952.

[11] Brainerd, C. J.; Reyna, V. F. (2005). *The science of false memory.* New York, NY, US: Oxford University Press.

are, indeed, one component of memory. But what is even less well-known is that over time, the images one associates with the event can change—and even be created.

Event related images can be altered or created through a number of processes. These may consist of exposure to verbal or written accounts that cause the person to generate images of the event (such as accounts of other witnesses, media accounts, etc.), or sensory images from other sources (such as media pictures, sounds or videos). They may also result from internal processes, such as the person's attempts to remember and picture the event, trying to imagine how things must have happened, etc. Some such internal processes are triggered by therapeutic procedures involving active imagination/imaging or hypnosis. Others may occur spontaneously, such as dreams, or sensory image associations triggered by exposure to reminders of the event. They may also be created through conversations with others or interviews, as described more fully in the section on suggestion.

A very common source of new images and beliefs is the simple effort to remember and try to picture what must have happened. These processes may occur without any external influence at all: just the person's own imagination and inferences processes about what could have or must have happened.

To the extent the person mistakenly attributes the source of such images to the experience of the original event, rather than to the real source, the images may be interpreted as a "memory" and reported as such.

A substantial body of scientific literature has shown that it is commonplace to confuse sensory images acquired independently of the original event as "memories" for the event[12].

***The Role of Belief***

Many false memories develop through persuasion that the event in question happened, or happened in a particular way[13]

It is much easier to create false autobiographical memories if the event itself is viewed as more plausible. Similarly, false memories for having committed an action can be more easily implanted if the person finds it plausible that he or she *would have* committed such an act (such as when a person who often behaves aggressively finds it

---

[12] Brainerd, C. J.; Reyna, V. F. (2005). *The science of false memory.* New York, NY, US: Oxford University Press.

[13] Leding, J. K. (2012). False memories and persuasion strategies. *Review of General Psychology, 16(3),* 256-268.

Nash, R. A., Wheeler, R. L., & Hope, L. (2014). On the persuadability of memory: Is changing people's memories no more than changing their minds? *British Journal of Psychology (online first)*

plausible that he or she *would have* committed another aggressive act)[14]. It is also easier to implant memories for things others have done if those actions are seen as plausible for the other person.

Many things that can happen in the course of interviewing or interrogating witnesses/suspects or that happen to the witness or suspect during the period surrounding the events in question can serve to increase the plausibility of the event for which false memories are formed. Among these is exposure to information that the type of behavior or event in question happens relatively frequently (versus rarely)[15], or repeatedly imagining the event in question[16].

In practice, there are many pathways through which beliefs of witnesses can be created or altered. These include conversations with other witnesses, police and other interviewers, exposure to media accounts, exposure to "evidence" that the event occurred in a particular way or was committed by a particular person. The person may also become convinced by internal processes: such as attempts to reason about what must have happened, attempts to understand the "evidence" he or she is aware of. In some cases, the person may interpret dreams as reflecting reality. Essentially, any source of information or argument can convince the person that a particular event, or version of that event is true.

Such information can do so directly, by seeming to provide evidence that the event did happen as believed. It can also do so indirectly, by making it more plausible that the event happened as believed: such as when information that a person is generally aggressive, or has a criminal record, can make it more plausible that he or she committed a specific aggressive act.

If the event in question involves sexual abuse or assault, such beliefs can come from many sources of suggestion. These can include others who have become concerned about the possibility of abuse; others who talk to the person in question about the general issue of abuse or their own (or about the abuser); information acquired in sex education classes, media, etc.; therapists; forensic interviewers, popular "survivor" literature and others.

Suggestion can cause a process called "relabeling," referring essentially to the reinterpretation of experiences not originally thought of as abuse or rape such that they

---

[14] Laney, C., & Takarangi, M. K. T. (2013). False memories for aggressive acts. *Acta Psychologica, 143,* 227-234.

Pezdek, K., & Hodge, D. (1997). Planting false childhood memories: The role of event plausibility. Psychological Science, 437–441.

[15] Golde, C. V., Sharman, S. J., & Candel, I. (2010). High prevalence information from different sources affects the development of false beliefs. *Applied Cognitive Psychology, 24,* 152-163.

[16] Bays, B., Zabrucky, K. M., & Gagne, P. (2012). When plausibility manipulations work: An examination of their role in the development of false beliefs and memories. *Memory, 20(6),* 638-644.

are now reinterpreted or "relabeled" as abuse or rape. The memory of what happened might not at first be distorted, but just reinterpreted. However, once a label is applied, memory will tend to shift to be consistent with that lable. For example, an experience newly labeled as rape might become remembered as involving greater violence or coercion than actual occurred.

***Suggestion, Imagery and Belief***

Suggestion can take many forms, all with potential to affect witness reports. Essentially suggestion involves any statement or action that states or implies a particular version of an event is true, or that others are not true. It may also state or imply that the speaker strongly believes what is suggested, and/or that the speaker strongly prefers that the witness reports a particular version of events. In effect, suggestion either plants an idea in the target's mind about either what might have or probably did happen, or what another person wants the target to say or do.

*Direct Suggestion.* A speaker (interviewer, other witness, family member, friend, etc.) may directly state the belief that the event in question did occur, and may further state how and why, and other details. The speaker may also directly state that he or she *does not believe* the version of events the witness offers.

*Closed-Ended Rather Than Open-Ended Questions.* Closed ended questions tend to be more suggestive than open: "Was the man old or young?" vs "How old was the man?" Note the first leaves out middle age.

*Leading Questions.* The speaker may ask questions in a manner that implies the answer: such as "Did you see the man with the hat." Vs "Did you see anyone?"

*Repeated Questions.* The speaker may repeat questions until the witness reports the desired answer. If the witness has already answered, and the speaker asks again, this implies that the speaker did not like or believe the witness's answer. Repeated questions have been shown to increase the incidence of false reports.

*Recounting What Others Have Said.* The speaker may tell the witness what others have said about the events in question. This can affect the witness's own beliefs about what took place. It can also suggest that the speaker will not believe accounts that differ from what was recounted by others.

*Disclosure of Other "Evidence".* The speaker may disclose other information to the witness that seems to be evidence of the truth of the suggested account. This can exert the same two effects as recounting what others have said.

*Selective Reinforcement.* The speaker may respond positively to witness statements consistent with the preferred account and negatively to those inconsistent with it. Such responses may include verbal responses (explicit statements of disagreement or agreement, praise, criticism, accusations of lying, etc.), nonverbal responses (smiling,

nodding, frowns, etc.), repeated questions (in response to witness statements inconsistent with the speaker's preferred account), threats (such as a parent's threat to punish the child for lying or police threats of prosecution), and others. This can affect the witness's beliefs about what happened, but can also affect their willingness to state anything inconsistent with what the speaker suggests.

*Inviting Speculation.* It is better not to ask the target to guess, speculate, pretend or imagine what happened. Instead, one should repeatedly ask the target to tell only the truth about what really happened, and explicitly instruct him or her not to guess, speculate, etc.

*Stereotype Induction.* A speaker may talk in a way that characterizes another person (e.g., the accused) in negative ways that can shape the witness's (e.g., a child regarding an adult; or an adult regarding another adult) beliefs about the person. These beliefs in turn can shape memories for events involving the person. In effect, such characterizations can make more plausible the actions the person is accused of.

In sum, the above forms of suggestion can create imagery of events that did not occur and increase belief that the events did occur, thereby increasing the risk of creating fully false memories for events that did not happen at all, or changing memories for those that did occur in some form. Moreover, they can create expectations of more approval/reinforcement for giving specific memory reports and expectations of disapproval/reinforcement for continuing to give the initial report. These processes have been shown to lead to false memories and false reports of dramatic personal experiences among both children and adults

## V. SUGGESTION AND COMPLIANCE

The suggestive processes reviewed above can lead to false reports by affecting memory, as shown by a large body of research. However, they can also lead to false reports by causing the witness to guess and/or by leading him or her to simply go along with the other's suggestions.

There is a strong tendency for witnesses to try to answer questions, particularly in response to parents, police, therapists, or others with authority. When the witness is not sure of the answers, but wants to comply and provide them, he or she may guess based on suggestive behaviors such as those reviewed above. The witness may believe the other person knows more about the event, and therefore be willing to provide the suggested account believing it must be the truth.

The witness may also know that the information is not true, but nevertheless comply with suggestion and provide the account seemingly desired by the other person. This may be done to either gain expected positive consequences of compliance (such as pleasing the interviewer, avoiding more questioning, or others) or to avoid negative consequences (displeasing the interviewer, incurring suspicion or further questions, etc).

Compliance is particularly likely to occur when the person making the demand or suggestion has power over the person in question, or when the desire to please the person making the demand or suggestion is strong.

## VI. VULNERABILITY TO SUGGESTION

Though all persons can be vulnerable to suggestion, some people suffer enhanced vulnerability. These include those with less intelligence, those with personalities associated with greater compliance with other's demands (e.g., need for approval, dependent personalities and others) or poorer cognitive functioning (e.g., some mental illnesses, ADHD, and others), younger children, older adults, etc. A person can also be more vulnerable at some times: such as when physically or mentally fatigued or distressed.

Vulnerability to suggestion may also be the result of the specific relationship of the suggestive person and the person in question. Those perceived as having greater expertise or power, for example, with have greater suggestive impact (both on overt behavior and compliance, and through effects on memory and belief).

**Vulnerability to Being Suggestive.** It is also important to consider the tendency of others to *be* suggestive. In the case of sexual abuse, for example, parents can be particularly suggestive in questioning their children when they are unusually concerned about the possibility of abuse. This concern can manifest in at least two important ways.

First, parents are sometimes overly concerned with the possibility of abuse. This can result from their own experiences of abuse as children, exposure to other's experiences of abuse, working around abused children, etc. This can lead them to talk about abuse with their children often and/or to repeatedly warn their children about abuse. Essentially abuse is "primed" on everyone's mind. [Priming refers to something that happens to put particular concepts at the forefront of consciousness]. When the idea and possibility of abuse is primed in adults or children this can lead them to overinterpret actions that may be innocent as abusive instead (e.g., to view innocent or affectionate touch as sexually motivated). This kind of misinterpretation can be responsible for initial mistaken reports of abuse, as well as for reinterpretation of past behaviors.

Second, parents for whom worries of abuse are salient often question their children more persistently and suggestively because they are both more worried that abuse *might* happen, and are often more convinced that it *did* happen.

## VII. MEMORY AND THE PROSECUTION OF OLD CRIMES

It should be noted that the prosecution of old crimes (years in the past) provides a substantial challenge with respect to the reliability of witness memories. Over time

memory is subject to a large number of potentially damaging influences.

First is the simple fading that occurs for all memories. Most of the detail for any event is forgotten immediately and is never accessible to memory. More detail fades as time goes on, leaving only memory for the gist of what happened.

Second, source dissociation occurs more and more over time. That is, the association between events and their context becomes weaker or dissolves, such that memory for when, with whom, in what order, or where something happened is progressively lost. The witness becomes more likely to confuse such things as which person said or did what, whether something happened before or after a specific event or time, who started a fight, etc.

Third, the potential for new information to interfere with, overwrite or distort the original memory increases. As time passes and the original information fades in memory, it becomes easier for new information to replace or distort the original memory. This may come from sources discussed earlier, such as conversations with other witnesses, police interviews, media accounts, and others. A substantial body of research has shown that new information acquired after the fact tends to distort memory for events toward consistency with the new information.

Fourth, the witness's own thought processes can result in memory change over time. Attempts to imagine or recreate the events in one's mind can cause the witness to imagine or picture the events differently than they happened. Research on "imagination inflation" has shown that such efforts to visualize can both distort memory and create false memories for things that never happened at all. This is an instance of source confusion, in that the person confuses the source of the images, believing that they came from the original event rather than from his or her own imagination.

Fifth, the witness's *beliefs* about what happened may change over time, causing a corresponding shift in "memory." The new information from various sources may cause such shifts in belief, as can the witness's attempts to process and understand the implications of what is remembered. Changes in belief may also be caused by changing relationships between the witness and suspect or changing motivations. Motivations are a primary source of beliefs, in that people find a way to believe what they want to believe. Regardless of the reason for belief shift, such changes can result in revised "memories."

Finally, most memories of the distant past are relatively less clear and witnesses are relatively less certain. This renders them more susceptible to sources of suggestion and to compliance with other's suggestions.

In general, a witness testifying about long past events may not be relying on an original memory of the event, but rather on a belief about what happened developed over time, on their own previous reports (which may be shown to them or mentioned to them), or on others' statements, accounts or suggestions.

## CONCLUSIONS

In sum, there are multiple pathways through which false allegations might arise. Unfortunately, many of these may be hidden, in that they can occur before and after first official reports as the result of interactions between the accuser and friends or relatives, teachers, therapists or others.

Once a false account has developed, it may be difficult to recognize as such. This difficulty occurs in part as the result of the well documented inability to accurately detect deception versus truth by listening to a person's account. In addition, however, if the accuser has developed false beliefs or memories the accounts will not be dishonest, but rather mistaken. Such false beliefs can be held with great conviction and sincerity.

## APPLICATION TO MR. BOAM

### RECORDS REVIEWED

Boam Probable Cause Affidavit And Police Reports #1-#5
Boam Trial Testimony of AT
Boam Trial Testimony of AT-2
2019-5821 09-30_Boam_TJ
2019-5821 12-31_Boam_TJ
2019-5821 Third Interview 4-14_Boam_TJ

### THE NATURE OF ALLEGATIONS

On 9/30/2019 Melinda Boam reported that her husband, Defendant Tel James Boam, had made a video recording of her and their 16 yr old daughter TA (DOB: 10/11/2003: Takyra Ashbocker: henceforth AVIC) in the shower without their knowledge. Melinda (henceforth AVM,) had located the video on her husband's phone and forwarded a copy to herself. When confronted, Defendant said he thought he had erased them. (Probable Cause Affidavit and Police Reports #1-#5, p. 6)

### Interview of AVIC AV 9/30/19

AVIC TA was interviewed on 9/30/19 at the Domestic Violence and Sexual Assault Center. At this time TA denied knowing why she was being interviewed. However, she described Defendant (her step-father) as wanting her to help him with cattle more than she had time for and more than she was willing. He wanted her to help more than he wanted others, such as AVM, grandfather and others to help. She reported spending a lot of time with Defendant, and that their relationship could be contentious. She respects her mother more than Defendant, and seems to have no problem talking back to him. She reported that he slapped her after one such instance. She described the current atmosphere of her family as involving a lot of frustration. AVIC described Defendant as spending a lot of time on his phone playing games or on tiktok. She also reported that

Defendant had asked various girls for nudes. She also reported that Defendant speaks ill of her mom when she is not around: calling her mean names such as bitch.

AVIC reported that she had stayed in an air bb with Defendant, where they slept in the same room (he in a king bed and her on a twin bed). However, she said nothing happened that shouldn't have (Probable Cause Affidavit and Police Reports #1-#5, p. 1-2)

After this interview TA was told about the nude video of her and her mother and was told this was the reason she was being interviewed. (Probable Cause Affidavit and Police Reports #1-#5, p. 2-3)

**Interview of Sister AA 9/30/19**

TA's sister AA was interviewed on the same day. She also did not know why she was being interviewed. AA reported that AVM and Defendant had been arguing lately, and described Defendant as being mean to them. She said that sometimes they would argue all night and prevent the kids from sleeping. She said that when AVM was not around, Defendant would yell, whack her (push her in the chest), push her down, and hold her against the wall: to the point that she has asked her mother not to leave her alone with Defendant. He also occaisionally slaps her in the face when she doesn't listen to him. She described defendant as slapping her around about 10 times, and pushing her down 6 or 7 times.

**Interview of sister TB 9/30/19**

Sister TB was also interviewed the same day. Like the others, she reported that her parents had been fighting a lot. TB denied that anyone hit or hurt her. (Probable Cause Affidavit and Police Reports #1-#5, p. 3).

AVM and the children moved out of the house on 9/27/19.

**Forensic Analyses of Phone and Other Digital Devices**

The phones of AVIC TA and AVM Melinda were forensically analyzed. AVIC TA's phone had a male nude and a number of suggestive anonymous messages sent to her, many asking for nude photos.

AVM Melinda's phone. The screen shot of the video from Defendant's phone was found.

Defendant's phone and various computer and other media were also analyzed. A number of nude or partially nude pictures were found on them. Most were identifiable as AVM Melinda. None were identifiable as a child. (Probable Cause Affidavit and Police Reports #1-#5, p. 5). Upon receipt on Defendant's iCloud contents Detectives did find videos of TA completely nude, taken in the bathroom. Videos stamped on 8/1/18 showed TA in the shower and bathroom. In the first TA turned and faced the camera

and grabbed a robe before the video ended. A second video showed a female the Detective believed to be TA in the shower with her back to the camera. She finished her shower, opened the curtain, and dried off. The video ended with TA in a towel facing the camera. A third video also depicted TA in the bathroom drying off. A second video stamped on 8/10/18 again showed TA in the bathroom. She was first sitting on the toilet with only a bra on. She went out of the camera's view, returned naked and got into the shower. A second video started with TA in the shower, getting out of the shower naked and toweling off.

A total of 16 sets of similar videos were recovered, timestamped from June to August of 2018, depicting AVIC TA in the bathroom, fully or partially naked. (Probable Cause Affidavit and Police Reports #1-#5, p. 13-18).

**AVIC AT Forensic Interview 12/31/19**

On 10/15/19 a detective met with AVIC TA and AVM Melinda. TA was shown a picture of a male on her phone that was not Defendant. She was also asked about the anonymous texts found on her phone asking for Nude pictures. She did not know who sent them. (Probable Cause Affidavit and Police Reports #1-#5, p. 25).

On 12/27/19 TA was shown a clip of one of the videos, and on the next day AVM sent an email saying that TA woke up with nightmares, and was remembering a time when she was touched by Defendant. A follow-up interview was conducted on 12/31/19.

It was during this interview that AVIC first disclosed any abuse by Defendant.

AVIC reported that the touching occurred at a time the family had booked a room in a hotel not too far from their home, so that they could use the facilities and swimming pool. She believed she was 14-15 at the time. The family had returned home after swimming, but TA wanted to go back to the hotel to get into the hotel hot tub, and Defendant wanted to as well. The two of them drove back to the hotel. While in the hot tub, AVIC said Defendant gave her an Ambien to help her sleep (which she said also made her forget things). She described Defendant as in the past giving her Ambiens all the time because she didn't sleep very well.

TA finished in the hot tub first and went back to the room to shower and get ready to go home. She was sitting on the bed texting people as she waited for Defendant. When he got back, he said he was going to shower, but she said she needed to pee first. When she finished and opened the door, Defendant was standing completely naked blocking the door. TA got away by ducking under his arm, and Defendant then showered. He came out just wearing a towel, but then grabbed his clothes and went back to put shorts on. AVIC described Defendant as having been drinking since morning, and TA did the driving.

TA then asked if he was ready to go home, but Defendant asked if they could stay the night: telling her that he was tired and wanted to sleep for a couple of hours. This was about 11PM, and they did not get home until about 2 or 3 in the morning.

Meanwhile, TA was sitting on one bed and Defendant on another. He told her to come over to his bed and started to rub TA's arm. She said it tickled and gave her goosebumps. TA then asked where goose bumps come from. Defendant asked if she wanted him to show her. He pulled her arm to make her touch his penis under his shorts (she thought he might have taken these off but wasn't sure) and tried to get her to have sex with him, pulling her on top of him. He touched her everywhere, under her clothes, from the knees up with both hands. TA reported that when he tried to have sex with her by pulling her on top of him, he slightly penetrated her before she got away and told him he was married to her mom, grabbed her stuff and told him she would be waiting in the car. Defendant was "in a ball" (dead silence) on the way home. When they got there, she locked herself in her room.

TA reporting thinking that his had happened multiple times but she does not remember any of it. However, she says she gets flashbacks of "Mackay." (This means she gets pieces of the puzzle every night, but different). There was both a bed and a cot. She thinks she fell asleep in the cot but woke up in the bed early in the morning. When she woke up she moved back to the cot. Defendant told her to take a shower, and she put the chain on the door. Defendant tried to get in the bathroom, telling her that he was making sure she got into the shower. She described this memory as foggy.

TA described another night when Defendant gave her an Ambien while they were out to "change water." When they got home TA went to sleep on the couch. But Defendant wanted to watch a movie. When TA woke up Defendant was sprawled out on top of her and she was having trouble breathing. She didn't remember whether they were wearing clothes. She got up and went to her bed.

TA also said that AVM Melinda had asked her about a time in Melinda's bed when she found Defendant on top of TA or something. TA said she had taken Ambien. Melinda woke Defendant up and "freaked out on him". TA does not remember this, but remembers Melinda asking her about it.

When asked what had led her to remember all this, TA said it was after she looked at the video footage from Defendant's iCloud. After that, she remembered in the middle of the night. She described it as having a nightmare that was the "memory," and went on to describe what she "remembered" in the dream. She said she had flashbacks of everything while she was sleeping. When Melinda woke her up, the puzzle pieces came together. She said she was in shock that night, and did not tell her mother until lunch the next day.

For some reason, TA was yawning frequently throughout this interview and seemed extremely sleepy.

(Probable Cause Affidavit and Police Reports #1-#5, p. 28-30, Video Interview: 2019-5821 12-31_Boam_TJ).

**AVIC TA Forensic Interview 4/14/2020**

AT was again yawning and appearing sleepy during this interview.

AVIC reported having another memory about Defendant. The families were at "Coulter's" house, and she sat on his lap at talked about "random" stuff. He laid down to stretch, and she felt triggered because that was the same position Defendant had had her in. It was one of the first nights he had given her Ambien. Defendant told her Ambien would help her sleep, but because she wasn't used to it she blacked out. Her mom couldn't sleep because TA was moving too much, and left for the couch. She remembers being on top of Defendant and having sex (intercourse: when one person's "thingy" goes into another's "thingy") with him at about 5 or 6 in the morning. She said it hurt, and involved a really sharp pain, and it gave her cramps. She doesn't remember how she got on top of him. She didn't' think she said anything to him. She said she was just laying there and didn't have the energy to get up. He pushed her off, and she went back to sleep. Later, she remembers having blood, even though she had recently finished her period and couldn't see why it would start again. TA described sleeping with AVM and Defendant quite often because she frequently had nightmares due to issues with her biological father.

When asked about other incidents, she said that everything was still cloudy. She did not remember the last time he gave her Ambien.

She did retell her recall of the hotel incident. She added that the next morning she didn't remember anything about the incident.

TA also added in this interview that Defendant occasionally gave her beer as well as the Ambien, but had trouble remembering any specifics.

TA was asked to describe more about Defendant's demeanor. She described him as an alcoholic who was angry much of the time, and prone to yelling.

**Trial Testimony: AVIC TA 3/16/22 17 yrs old**

At trial TA reported that she loved Defendant, trusted him, and wanted him to adopt her (Trial transcript, p. 392). TA described the incidents of alleged abuse much as she had in her previous interviews, with a few additions.

**ANALYSIS**

AVIC TA initially had no memory of the incidents of abuse she eventually reported. She assertedly "recovered" the memories after she learned that Defendant had been video-taping her in the bathroom, naked much of that time. At that point, it would be

natural to view Defendant as the type of person who was at least somewhat perverted, and perhaps likely to try to have sex with persons who he was videoing naked. At the least it suggested an inappropriate sexual interest in his step-daughter. It would also be natural for TA and her mother to spend time talking about, and ruminating privately about, his behavior and its meaning, and speculating about why he did it, and what it meant for his interest in, and intentions toward, TA. This new information took place in the context of her reported love for Defendant, and her frequently sleeping in his bed: which in itself could trigger sexual thoughts.

After TA was asked to view one or more of these videos, she was naturally upset and concerned about them. She went on to have a nightmare in which the incidents of abuse she later reported were first "remembered." In her interview of 12/31/19 she described the dream itself as memories coming back to her in flashbacks while she was dreaming, and then putting it all together as she awoke. By trial, she described the recovered memories as "flashbacks" and denied that they were dreams (Trial Transcript, pp 446-447). However, her first account is more credible, in that it was offered spontaneously before the opportunity for subsequent conversations and trial preparation to alter her interpretation. Even then, she described the flashbacks as revealing puzzle pieces by puzzle pieces rather than as coherent event memories.

Scientific studies have shown that dreams do not replay events. Instead dreams assemble content based on what is in the dreamer's mind: incorporating events and concerns of the day—or generally what is on the dreamer's mind as the result of those daily events and concerns. Sexuality/sexual concerns surrounding her step-father were a central focus for TA and her mother, and were particularly in focus at the time of the dream due to the meeting they had that day in which detectives played one or more videos of TA naked in the shower. In this context, it is not surprising that TA had dreams of her step-father, nor is it surprising that they including sexual content.

However, in contradiction to what TA believed, the dream was not a set of memories of actual events. It was simply the mind putting together a dream based on the swirling mix of information and thoughts resulting from the situation they were in with Defendant and his actions.

Once the concerns regarding Defendant's actions, thoughts, and intentions, along with memories of the videos she had seen became a significant focus for AV, it is not surprising that she would have sudden thoughts during the day related to the thoughts and memories (real and otherwise) that she already had. The new "memory" that was subsequently "triggered" by her interaction with Coulter at his house could well be just a thought or image that came to mind strictly by association with the thoughts and "memories" she already had been thinking about so much. Everyone has thoughts triggered in this way that we don't label as memories because the context we are in tells us that they are not real. But in a context where one believes all the related information surrounding the new thought is indeed real, it is easier to assume that the new thought is also about a real event (i.e., is a memory, rather than just imagination). Generally, as noted in the main body of the report, when one ruminates about sexual abuse, tries to

remember, or tries to understand, images are generated in one's head that can be confused with real memories. Additionally, one can come to believe that abuse events "must have" taken place based on many factors: such as conversations with others, one's own attempts to reason about what must have happened and why, and so on.

The conclusion that AVIC TA's "memories" are false is supported by her own account of the role of Ambien in her initial lack of memory for any of these events.

**Effects of Ambien**

AVIC TA described Ambien as affecting memory and causing her to forget at several times in her interviews and testimony. For example, she described in her testimony a time when she had Ambien while a friend was over. They had a "huge" conversation, but she didn't remember any of it. Her friend told her about it, but she still didn't remember it as of trial (Trial Transcript, p. 399). She also testified that she didn't report any abuse in her first forensic interview because "of the Ambien, I had forgotten almost everything, and so I didn't remember anything." She again admitted that the "memory" came back after she learned about the shower videos of her. (Trial Transcript, p. 406).

Ambien does have documented effects on memory that are much like those of alcohol. That is, it can have both positive and negative effects on memory. The negative effects are consistent with what TA reported. That is, Ambien, like alcohol, can cause a person to experience "blackout" (failure to form new memories). Although the person can still walk and talk and engage in many activities after taking Ambien and before falling asleep, the "memory" of these events never transfers from short-term to long-term memory: therefore no long term memory is formed and it is not available for retrieval at a later time. These effects occur through Ambien's effects on the neurotransmitters in the brain areas required for memory formation and consolidation: such as the hippocampus, for example. When AT states that she didn't remember an event that occurred after she took Ambien the next morning (for example, the hot tub night's alleged abuse), this means she also did not form a memory for the night, and cannot suddenly remember it later (referred to as "Ambien amnesia."). Retrieval of a memory requires that it was encoded and consolidated first, and TA's own account confirms that they were not.

The positive side of memory effects for Ambien concern consolidation of memories for things prior to taking the Ambien. The same occurs for alcohol, and for the same reasons. That is, memory consolidation for events is better if one sleeps immediately after they occur. In this way, there is no additional information that competes for memory resources and creates "interference" for the memory in question. This is similar to findings that if one sleeps immediately after studying for a test, the information is recalled better during the test. Alcohol and Ambien fuction in a way similar to sleep. To the extent that alcohol or Ambien prevent the encoding of new memories, they cannot create interference with memories of things that happened before the substance was ingested. Hence, if one first studies and then either takes Ambien or drinks sufficient alcohol, one will also remember better when taking the test the next day. These effects

have been demonstrated in a number of scientific studies, as have the negative effects on memory for things experienced *after* ingesting alcohol or Ambien. They are also described in numerous websites warning of side effects of Ambien and similar drugs (these can be easily accessed with search terms Ambien and memory).

**Conclusions**

If AVIC's account of her use of Ambien and its effects is correct then it is at the least very highly unlikely, and more probably impossible, that she retrieved actual memories of abuse. She reported that she had no memories of these events, except as she believed they were replayed in a dream, and in the form of a sudden thought that came to her as she interacted with Coulter when he was in a position she had previously "remembered" in her dream. These accounts cannot be considered reliable evidence that the recounted events took place.

Generally, trial counsel did not call a relevant expert to develop these issues, nor did he engage in effective cross-examination of AVIC to bring out the weaknesses in her testimony.

I will be happy to revise this report upon receipt of further relevant information.

Sincerely,

Deborah Davis

Professor of Psychology
University of Nevada, Reno